UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

RUBEN DARIO REYNOSO,                  :

                    Plaintiff,        :    13 Civ. 5587 (HBP)

     -against-                        :    OPINION
                                           AND ORDER
CAROLYN W. COLVIN, acting             :
Commissioner of Social Security,
                                      :
                    Defendant.        :
----------------------------------X

            PITMAN, United States Magistrate Judge:


I.   Introduction


            Plaintiff, Ruben Dario Reynoso, brings this action

pursuant to Section 205(g) of the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner")

denying his application for disability insurance benefits ("DIB")

and supplemental security income benefits ("SSI").  The Commis-

sioner has moved for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure (Notice of Motion,

dated July 14, 2014 (Docket Item 34)).  Plaintiff has cross-moved

for judgment on the pleadings (Notice of Motion, dated August 14,

2014 (Docket Item 37)).

The parties have consented to my exercising jurisdiction for all purposes pursuant to 18 U.S.C. § 636(c).

For the reasons set forth below, I deny the Commissioner's motion for judgment on the pleadings and grant the plaintiff's motion for judgment on the pleadings to the extent of remanding this matter for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

II.   Facts

    A.   Procedural
        Background

Plaintiff filed applications for SSI and DIB on September 21, 2010 (Tr.[1] 210, 215), claiming that he had been disabled since May 1, 2009 (Tr. 208, 214).  The Social Security Administration denied plaintiff's application, finding that he was not disabled (Tr. 59-64).  Plaintiff timely requested and was granted a hearing before an Administrative Law Judge ("ALJ") (see Tr. 42-56).  ALJ Richard J. Ortiz-Valero conducted a hearing on March 15, 2012 (Tr. 42-56).  In a decision dated May 8, 2012, ALJ Ortiz-Valero determined that plaintiff was not disabled within

---

[1]"Tr." refers to the administrative record that the Commissioner filed with her answer, pursuant to 42 U.S.C. § 405(g) (see Notice of Filing of Administrative Record, dated October 9, 2013 (Docket Item 15)).

2

the meaning of the Act (Tr. 26-37).  The ALJ's decision became the final decision of the Commissioner on June 8, 2013, when the Appeals Council denied plaintiff's request for review (Tr. 1-6).  Plaintiff commenced this action seeking review of the Commissioner's decision on August 9, 2013 (Complaint (Docket Item 1)).

B.  Plaintiff's
    Social Background

Plaintiff was born on May 20, 1961 (Tr. 235).  Plaintiff reported that he does not speak English, although he appears to have filled out forms on his own and testified in English at his hearing (Tr. 238).  Plaintiff completed the eleventh grade (Tr. 240).  His prior work includes post office clerk, truck loader, sales attendant at a hardware store, security guard and paint stripper (Tr. 240; see Tr. 49).

Plaintiff reported that as a sales attendant at a hardware store, he walked, stood, kneeled and crouched for eight hours per day; sat for forty-five minutes per day; climbed for three hours per day; stooped, crawled and handled objects for seven hours per day; and wrote or typed for four hours per day (Tr. 249).  He reported that the heaviest weight he lifted as a sales attendant was one hundred pounds and that he frequently lifted fifty pounds (Tr. 249).

In a Function Report dated October 13, 2010, plaintiff reported that as a result of his medical conditions, he could no longer kneel, stand, sit, run or climb stairs (Tr. 255). He also stated that his pain prevented him from sitting, standing or walking for long periods of time (Tr. 259). Plaintiff reported that he could walk half a mile before needing to rest and that, after walking such a distance, he needed to rest for half an hour before he could continue walking (Tr. 260). He reported that he had no difficulty cooking, cleaning, shopping or doing laundry on his own, although he also stated that sometimes pain prevented him from engaging in these activities (Tr. 256-57, 263). Plaintiff stated that he spent his days watching television or reading and that he socialized very often and had no difficulty getting along with anyone (Tr. 258). He also wrote that he experienced no difficulties with stress, coworkers, supervisors or changes in schedule (Tr. 261).

C.   Plaintiff's
     Medical Background[2]

     1.   Plaintiff's
          Physical Condition

          a.   Dr. Bratu

Dr. Simona Bratu treated plaintiff for HIV from approx-
imately September 2009 through June 2010 (Tr. 304-33).  On
November 13, 2009, Dr. Bratu wrote that plaintiff reported
feeling "very well," and that he was tolerating his medication
well with no side effects (Tr. 304).  Dr. Bratu also reported at
that time that plaintiff was able to walk fifty blocks on flat
ground and could climb seven flights of stairs (Tr. 304).  In
January 2010, Dr. Bratu reported that plaintiff's HIV viral load
was undetectable (Tr. 333), and Dr. Bratu reported that plaintiff
continued to feel good and that his HIV continued to be con-
trolled as of June 4, 2010 (Tr. 331-32).

          b.   Dr. Salon

Dr. Aurelio Salon, a consulting internist, examined
plaintiff on October 22, 2010 (Tr. 341).  He found that "[o]n the

_____

[2]I recite only those facts relevant to my decision.  The
administrative record more fully sets out plaintiff's medical
history (Docket Item 15).

basis of history and physical just performed, there are no objective findings to support the fact that the claimant would be restricted in his ability to sit or stand or in his capacity to climb, push, pull or carry heavy objects" (Tr. 344).

### c.   Dr. Kim

Dr. Susan Kim treated plaintiff for diabetes in 2010 and 2011.  Dr. Kim found that plaintiff's diabetes was well-controlled (Tr. 28 (October 2010), 490 (January 2011), 508-11 (April 2011), 523-30 (July 2011)).

### d.   Dr. Agrawal

Plaintiff appears to have seen Dr. Vikas Agrawal three times for pain in his left hand.  On November 9, 2010, Dr. Agrawal found that this pain was most likely the result of tendonitis or muskuloskeletal disease, but that it was possibly caused by carpal tunnel syndrome (Tr. 481).  On March 15, 2011, plaintiff had had an electromyography ("EMG") done, which indi-cated that he probably had carpal tunnel syndrome (Tr. 499).  Dr. Agrawal prescribed a splint and recommended more aggressive treatment if plaintiff was still in pain in two or three months (Tr. 499).  On June 28, 2011, although plaintiff reported only a twenty percent improvement in his left hand symptoms, he told Dr.

Agrawal that he did not wish to pursue more aggressive treatment (Tr. 520).

> e.   Dr. Bella

Plaintiff appears to have seen Dr. Jonathan Bella, a cardiologist, on three occasions.  On February 23, 2011, Dr. Bella reported that plaintiff

> had an echocardiogram, which revealed concentric remodeling with mild diastolic dysfunction, thickened mitral valve with moderate mitral regurgitation, aortic valve sclerosis[3] and trace tricuspid regurgitation.  This is consistent with hypertensive heart disease with mild diastolic dysfunction.  [Plaintiff] also had a stress echocardiogram, which revealed a hypertensive blood pressure response to exercise, but essentially normal stress echocardiogram with no evidence of inducible wall motion abnormalities at peak exercise. . . . [Plaintiff] denie[d] any complaints of chest pain, shortness of breath, nausea, vomiting, nocturnal dyspnea[4] or bipedal edema.[5]  He [wa]s ambulating well without any complaints and walk[ed] up [to] half a mile without any symptoms

(Tr. 494).

On November 10, 2011, plaintiff complained of chest pain, and Dr. Bella recommended a stress echocardiogram (Tr.

---

[3]"Sclerosis" is hardening.  Dorland's Illustrated Medical Dictionary, ("Dorland's") at 1496 (27th ed. 1998).

[4]"Dyspnea" is "difficult or labored breathing."  Dorland's at 520.

[5]"Edema" is the "presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body."  Dorland's at 530.

7

482).  Dr. Bella conducted another exam on November 14, 2011,
with substantially identical results to the exam of February 2011
(Tr. 560).  Dr. Bella also reported that plaintiff's blood
pressure was better controlled at that time (Tr. 560).

       f.   <u>Dr. Malaret</u>

      Dr. German Malaret, a medical expert, completed a
medical source statement on November 16, 2011 (Tr. 351).  Dr.
Malaret did not conduct an in-person examination of plaintiff and
based his statement on a review of plaintiff's medical records.
He found that plaintiff could frequently lift and carry up to
twenty pounds, could occasionally carry up to fifty pounds but
could never carry more than fifty pounds (Tr. 346).  Dr. Malaret
opined that plaintiff could sit, stand and walk for six hours
continuously and could sit, stand or walk for a total of eight
hours in an eight-hour work day (Tr. 347).  He wrote that plain-
tiff had no limitations on reaching, handling, fingering or
feeling, and could push and pull frequently with each hand (Tr.
348).  Dr. Malaret opined that plaintiff could occasionally climb
ladders and scaffolds, could frequently use his feet for foot
controls, climb stairs and ramps, kneel, crouch and crawl, and
had no restrictions on balancing or stooping (Tr. 348-49).  Dr.
Malaret also found that plaintiff could operate a vehicle but

could only occasionally perform work involving unprotected heights or extreme cold and heat, and could frequently perform work involving moving mechanical parts, humidity and wetness, dust, odors, pulmonary irritants, fumes or vibrations (Tr. 350).

g.   Dr. Kanter

Dr. Timothy Kanter was plaintiff's primary care physician who saw plaintiff monthly beginning September 22, 2009 (see Tr. 376).  On January 6, 2011, plaintiff reported chest pain, but had an exam which was "unremarkable" and a stress echocardiogram which was normal (Tr. 387-89, 489 (January 18, 2011)).  On April 5, 2011, Dr. Kanter wrote that plaintiff reported that he was not experiencing any uncontrolled pain at that time (Tr. 501).  Dr. Kanter recommended exercises and stretching for plaintiff's "lower back discomfort" and prescribed Celebrex for plaintiff's arthritis (Tr. 503).  Dr. Kanter's monthly notes do not have much detail, beyond making note of the specialists plaintiff saw, and are substantially the same each month (see Tr. 514-17 (May 2011), 531-34 (July 2011), 544-47 (August 2011), 550-53 (September 2011), 553-56 (October 2011), 556-58 (November 2011), 563-66 (December 2011), 568-71 (January 2012)).

On September 28, 2011, plaintiff had X-rays of his knees and feet because he had been reporting joint pain (Tr. 384,

9

403-04).  None of the X-rays disclosed any evidence of acute
fracture or dislocation (Tr. 384).  The X-ray of plaintiff's knee
revealed minimal patellofemoral[6] spurring, and the X-ray of
plaintiff's feet revealed minimal dorsal midfoot degenerative
joint disease and mild hallux valgus[7] (Tr. 384).

On November 1, 2011, plaintiff had X-rays taken of his
shoulder and hands because he had been reporting joint pain (Tr.
385, 399-402).  These X-rays also disclosed no acute fracture or
dislocation (Tr. 385-86).  The X-ray of plaintiff's shoulder
revealed possible posttraumatic osteolysis[8] or inflammatory
arthritis (Tr. 385).  The X-rays of plaintiff's hands revealed
mild degenerative changes (Tr. 386).

Dr. Kanter completed a medical source statement on
January 23, 2012.  In that report, Dr. Kanter wrote that plain-
tiff had longstanding joint pain as a result of arthritis and
that he was being treated for depression (Tr. 376).  Dr. Kanter
opined that plaintiff's conditions significantly limited his
ability to perform basic work activities (Tr. 377).  Dr. Kanter
also noted that in an eight-hour workday, plaintiff could sit for

---

[6]"Patellofemoral" pertains to the knee cap and the thigh
bone.  See Dorland's at 617, 1241.

[7]"Hallux valgus" is the "ben[ding] outward, twist[ing]" of
"the great toe."  See Dorland's at 729, 1803.

[8]"Osteolysis" is "dissolution of bone."  Dorland's at 1199.

10

six hours continuously; stand for two hours continuously, and
walk for one hour continuously (Tr. 379).  He further wrote that
plaintiff could lift and carry five pounds occasionally, but
could never lift or carry more than five pounds (Tr. 379).  He
also found that plaintiff could never climb or crawl (Tr. 379).
Dr. Kanter opined that plaintiff could occasionally bend, squat,
reach and use his hands and feet for repetitive motions (Tr. 379-
80).  He found plaintiff to be totally restricted from performing
work involving unprotected heights, moving machinery, exposure to
marked changes in humidity, driving a motor vehicle or exposure
to dust, fumes, gases or noxious odors (Tr. 380).  Dr. Kanter
opined that plaintiff's conditions met the Listing of Impairments
in 20 C.F.R. Part 404, Subpart P, Appendix 1, writing that
plaintiff's depression restricts him from performing in a work
environment and that plaintiff's arthritis limits his physical
abilities (Tr. 381).

h.   Dr. Tieng

        Dr. Arlene Tieng, a rheumatologist, saw plaintiff for
the first time on February 6, 2012, and she found that plaintiff

suffered from polyarthralgia[9] and osteoarthritis (Tr. 397-98, 685).  She prescribed physical therapy and Naproxen (Tr. 398).

On February 21, 2012, Dr. T. Kato completed a medical source statement on behalf of Dr. Tieng (Tr. 390-95).  Dr. Kato reported that plaintiff had pain in his shoulders, hands, knees, legs and back (Tr. 390).  Dr. Kato opined that, in an eight-hour work day, plaintiff could sit for four hours continuously and sit for a total of eight hours, stand continuously for four hours and stand for a total of eight hours, and walk continuously for ten minutes and walk for a total of one hour (Tr. 393).  Dr. Kato also found that plaintiff could lift and carry five pounds occasionally but could never lift or carry more than five pounds (Tr. 393).  She wrote that plaintiff could never climb or crawl, but that he could bend, squat and reach occasionally (Tr. 393).  Dr. Kato also wrote that plaintiff could not use his hands or feet for repetitive motions and that plaintiff was unable to perform work that involved unprotected heights, exposure to marked changes in temperature and humidity or driving a motor vehicle (Tr. 394).  According to Dr. Kato, plaintiff was mildly restricted from performing work involving moving machinery or exposure to dusts, gases, fumes or noxious odors (Tr. 394).

---

[9]"Polyarthralgia" is pain in many joints.  See Dorland's at 147, 1328.

2.   Plaintiff's
     Mental Condition

Dr. Virginia Contreras, plaintiff's treating psychia-
trist, first saw plaintiff on March 2, 2011 (Tr. 356).  Treatment
notes from that date report that findings from plaintiff's mental
status exam were normal, although plaintiff's mood was depressed
(Tr. 690).  The notes from that date also indicate that Dr.
Contreras diagnosed plaintiff with insomnia and prescribed Ambien
(Tr. 691).

Dr. Contreras completed a medical source statement on
March 22, 2011, writing that plaintiff suffered from major
depression and that his prognosis was poor (Tr. 358).  Dr.
Contreras wrote that she had prescribed plaintiff Seroquel and
Ambien (Tr. 358).  Dr. Contreras found that plaintiff had no
limitations on the performance of his daily activities; however,
she also found that plaintiff had marked limitations in social
functioning, was unable to concentrate and had marked restric-
tions on his ability to understand, to remember and carry out
instructions, to respond appropriately to supervision, coworkers
and customary work pressures, to satisfy an employer's normal
quality, production, and attendance standards, and to perform
simple or complex tasks on a sustained basis in a work setting

(Tr. 359-62).  Dr. Contreras found that plaintiff continually experienced episodes of decompensation and that even a marginal increase in mental demands or a change in environment would likely cause plaintiff to decompensate (Tr. 360-61).

Dr. Contreras further opined that plaintiff had a condition equal to a Listed Impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 365).  She indicated that plaintiff had an Organic Mental Disorder at listing level under Section 12.02, and wrote that his symptoms included memory impairment, perceptual or thinking disturbances (e.g., hallucinations, delusions), change in personality, disturbance in mood and emotional lability[10] (Tr. 365).  Dr. Contreras also opined that plaintiff had an Affective Disorder at listing level under Section 12.04, and that he experienced symptoms of guilt, an-hedonia,[11] appetite and sleep disturbance, decreased energy, difficulty concentrating or thinking and thoughts of suicide (Tr. 368).  Despite indicating under her Section 12.02 analysis that plaintiff did have hallucinations or delusions, under Section 12.04 Dr. Contreras indicated that plaintiff did not have hallu-cinations or delusions (Tr. 368).

---

[10]"Lability" is "emotional instability[,] rapidly changing emotions."  Dorland's at 886.

[11]"Anhedonia" is "total loss of feeling of pleasure in acts that normally give pleasure."  Dorland's at 89.

On March 23, 2011, Dr. Contreras wrote that plaintiff had difficulty sleeping even when taking his medication, but that plaintiff was eating adequately (Tr. 500). She found plaintiff's mood, memory, perception, thought process and attention were all normal and noted that he had no suicidal thoughts (Tr. 500). Notes from April 26, 2011 again indicate a normal mental status exam, although plaintiff's mood was depressed, and Dr. Contreras prescribed Wellbutrin (Tr. 512). On June 21, 2011, plaintiff's mental status exam was normal, but he was still experiencing difficulty sleeping (Tr. 521-22). Dr. Contreras found plaintiff's mental status to be normal again on August 9, 2011, and she wrote that plaintiff was stable and was sleeping and eating adequately (Tr. 537-38). Plaintiff had another mental status exam with normal results on September 21, 2011 (Tr. 547-48), and on November 22, 2011, but in November he was again having difficulty sleeping (Tr. 562-63). In January 2012 plaintiff's mental status exam was normal except for a depressed mood (Tr. 566-67).

3. <u>Additional Evidence</u>

Plaintiff submitted certain additional treatment records to the Appeals Council.

Plaintiff submitted treatment notes, dated June 20, 2012, from Dr. Kanter (Tr. 674-78). These notes contain information from prior visits. The notes from June 5, 2012 indicate that plaintiff had started receiving physical therapy but experienced increased discomfort after three sessions (Tr. 676). These notes also state that plaintiff had begun to experience lower back discomfort (Tr. 676). The notes from June 13, 2012 report that plaintiff's shoulder and hand pain was not significantly better with conservative treatment and that plaintiff was planning to see an orthopedist (Tr. 675). Plaintiff also submitted a letter from Dr. Kanter dated July 2, 2012 in which Dr. Kanter wrote that his assessment of plaintiff's work abilities was based on "an extensive workup" that dated from September 2009 (Tr. 665). He also stated that plaintiff had seen several specialists but continued to experience pain (Tr. 665). Dr. Kanter further noted that plaintiff's treating psychiatrist found that plaintiff's depression rendered him unable to work (Tr. 665).

Plaintiff also submitted additional treatment notes from Dr. Contreras. Treatment notes from March 22, 2012 state that plaintiff reported feeling depressed, being unable to sleep despite sleep medication, and experiencing pain in his left shoulder (Tr. 670). Plaintiff's mental status exam of the same day was normal, but Dr. Contreras wrote that plaintiff was

depressed and had insomnia (Tr. 670).  Treatment notes from May 22, 2012 state that plaintiff was depressed, and his mental status exam from that date indicated that he had a depressed mood and congruent affect, but was otherwise normal (Tr. 668).

Plaintiff also submitted notes from Dr. Joseph Sacco, who provided a pain management consultation to plaintiff on June 12, 2012 (Tr. 679).  These notes indicate that plaintiff had begun physical therapy in February 2012 and that plaintiff continued to receive physical therapy (Tr. 679).  Dr. Sacco prescribed Percocet for plaintiff's pain because Naprosyn and Acetaminophen were not relieving plaintiff's symptoms (Tr. 679).

A note from Dr. Kanter further stated that both Dr. Contreras and Dr. Sacco have extensive experience in their fields (Tr. 665).

    D.   Proceedings
         Before the ALJ

         1.   Plaintiff's
              Testimony

At the hearing, the ALJ first asked plaintiff's attorney whether he had any questions for plaintiff (Tr. 45).  The attorney questioned plaintiff about the length of time he had seen the physicians who evaluated his working ability and pointed

17

out that the consulting physicians had seen plaintiff only for evaluation purposes (Tr. 47). The attorney then stated that he had no further questions for plaintiff (Tr. 48).

The ALJ also had no questions for the plaintiff and stated:

> What this really comes down to, Counsel, is as long as you can provide the supporting documentation to those medical source statements, which clearly put [plaintiff] both needing a listing for the emotional condition and definitely less than sedentary for the physical conditions, then that's fine. I just, you know, I just don't like basing decisions on medical source statements that don't have any backing supporting documentation. . . . [S]o as long as there's supporting documentation, we won't have a problem in this case. Just in case, though, I'm going to go to the vocational expert in case, you know, you can't come up with any progress notes or anything like that just to cover our bases.

(Tr. 48).

### 2. Vocational Expert's Testimony

The ALJ posed questions to the vocational expert about an individual with two hypothetical descriptions of a Residual Functional Capacity ("RFC"). The ALJ told the vocational expert to base her first answer on a person who had the RFC to

> lift, carry a maximum of 50 pounds and frequently 25 pounds, sit for six hours in an eight-hour day, stand and/or walk for six hours in an eight-hour, and is limited to occasionally climbing ladders and scaffolds,

> and must avoid exposure to unprotected heights, extreme
> cold, extreme heat

(Tr. 53-54).  The ALJ asked the vocational expert whether such a
person could perform plaintiff's former jobs (Tr. 54).  The
vocational expert responded:  "With those limitations, no, he's
not able to perform his former job [sic] except material handler,
loader and unloader that is heavy" (Tr. 54).  The foregoing
answer is inconsistent with the vocational expert's earlier
testimony categorizing plaintiff's prior jobs, other than loader
and unloader, as light work (Tr. 49-50).  By testifying that
plaintiff could not perform his prior jobs other than loader and
loader, the vocational expert was effectively testifying that
plaintiff could not perform the prior jobs that were light work
but that he could perform the prior job that constituted heavy
work.  The ALJ did not attempt to clarify this contradiction.

       The ALJ then asked the vocational expert to assume an
individual who had the RFC to

> lift, carry occasionally up to five pounds, sit for six
> hours in an eight-hour day, stand and/or walk for two
> hours in an eight-hour day, can never crawl or climb
> and can only occasionally bend, squat, reach.  He's
> also limited to occasionally grasping or fingering or
> pushing and pulling with either hand, so that's gross
> manipulation and fine manipulation.  Can only occasion-
> ally operate foot controls with either foot.  Must not
> be exposed to unprotected heights, moving machinery,
> extreme humidity, wetness, heat, cold, fumes, odors,
> dust, or gases, and he cannot drive a vehicle either

(Tr. 54).   The ALJ asked the vocational expert whether such a person would be able to perform any of plaintiff's past work, and the vocational expert responded that such a person could not perform any of plaintiff's past work (Tr. 54-55).   The ALJ followed up by asking the vocational expert whether a person with this RFC would be able to perform any work in the regional or national economy, and the vocational expert testified he would not (Tr. 54-55).

> The ALJ then stated to plaintiff's attorney that,
>
> Counsel, if you have any questions for [the vocational expert], consider that my hypothetical, my last one is of course based on the medical source statements, so if I receive the information backing up these statements, then I plan on going with that hypothetical.  And of course, if I get the information for the psychiatric medical source statement, on that statement he will definitely meet the listing.  So I just want to give you a heads up where I'm going.  If I don't receive anything, though, then I'm going to have to look at everything again and possibly use my first hypothetical because up until today I didn't have any of these medical source statements.  And based on the evidence that came in prior to the medical source statements, it wasn't very favorable to the Claimant, neither from DDS nor from my interrogatory nor anything else.  So just keep that in mind, so any information you get me, treatment notes, any objective evidence, it will be very material to my decision, okay? . . . Do you have any questions for [the vocational expert]?

(Tr. 55).   Plaintiff's attorney declined to ask the vocational expert any questions because he believed plaintiff "definitely w[ould] fit under the second hypothetical" (Tr. 55).

20

III. <u>Analysis</u>

    A.    Applicable
        <u>Legal Principles</u>

      1.  <u>Standard of Review</u>

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.); <u>accord</u> <u>Johnson v. Bowen</u>, <u>supra</u>, 817 F.2d at 986, but "where application of the correct legal principles to the record could lead to only one conclusion, there

is no need to require agency reconsideration," <u>Johnson v. Bowen</u>, <u>supra</u>, 817 F.2d at 986.

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Talavera v. Astrue</u>, <u>supra</u>, 697 F.3d at 151, <u>quoting</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (<u>per</u> <u>curiam</u>), <u>quoting</u> <u>Schauer v. Schweiker</u>, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" <u>Selian v. Astrue</u>, <u>supra</u>, 708 F.3d at 417, <u>quoting</u> <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (<u>per</u> <u>curiam</u>). Where, as here, the claimant has submitted new evidence to the Appeals Council following the ALJ's decision, such evidence becomes part of the administrative record. <u>See</u> <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999) (<u>per</u> <u>curiam</u>); <u>Perez v. Chater</u>, 77 F.3d 41, 45 (2d Cir. 1996).

2. Determination
of Disability

A claimant is entitled to SSI and DIB benefits if he can establish an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).[12]  The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D), and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  Whether such work is actually available in the area where the claimant

---

[12]The standards that must be met to receive DIB benefits under Title II of the Act are the same as the standards that must be met in order to receive SSI benefits under Title XVI of the Act.  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases addressing the latter are equally applicable to cases involving the former.

resides is immaterial.  42 U.S.C. §§ 423(d)(2)(A),
1382c(a)(3)(B).

In making the disability determination, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Brown v. Apfel, supra, 174 F.3d at 62; DiPalma v. Colvin, 951 F. Supp. 2d 555, 565 (S.D.N.Y. 2013) (Peck, M.J.).

The Commissioner must follow the five-step process required by the regulations.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The first step is a determination of whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If he does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the answer to this inquiry is affirmative, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

24

If the claimant does not meet any of the listings in Appendix 1, step four requires assessment of the claimant's RFC and whether he can still perform his past relevant work given his RFC.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25.  If he cannot, then the fifth step requires assessment of whether, given claimant's RFC, he can make an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot make an adjustment to other work, he will be found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151.

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in para-graphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945." Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (S.S.A. July 2, 1996).  The results of this assess-ment determine the claimant's ability to perform the exertional

25

demands of sustained work and may be categorized as sedentary, light, medium, heavy or very heavy.  20 C.F.R. §§ 404.1567, 416.967; see Rodriguez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL 150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).  This ability may then be found to be further limited by nonexertional factors that restrict the claimant's ability to work.  See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005); Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than his past work.  Selian v. Astrue, supra, 708 F.3d at 418; Butts v. Barnhart, supra, 388 F.3d at 383.

In some cases, the Commissioner can rely exclusively on the Medical-Vocational Guidelines ("the Grid") contained in 20 C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995).  "The Grid takes into account the claimant's RFC in conjunction with the claimant's age, education and work

26

experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy." Gray v. Chater, supra, 903 F. Supp. at 298; accord Butts v. Barnhart, supra, 388 F.3d at 383.

The Grid may not be relied upon exclusively in cases where the claimant has nonexertional limitations that significantly restrict his ability to work.  Butts v. Barnhart, supra, 388 F.3d at 383; Bapp v. Bowen, supra, 802 F.2d at 605-06.  When a claimant suffers from a nonexertional limitation such that he is "unable to perform the full range of employment indicated by the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid fails "to describe the full extent of a claimant's physical limitations," Butts v. Barnhart, supra, 388 F.3d at 383, the Commissioner must introduce the testimony of a vocational expert in order to prove "that jobs exist in the economy which claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 384 (internal quotation marks and citation omitted); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

B.    The ALJ's Decision

As an initial matter, the ALJ found that plaintiff met the insured status requirements of the Act through March 31, 2014 (Tr. 28).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since May 1, 2009 (Tr. 28).

At step two, the ALJ found that plaintiff had severe impairments, including diabetes, hypertension, HIV, osteo-arthritis and depression (Tr. 28-29).

At step three, the ALJ found that plaintiff did not meet any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 29).

At step four, the ALJ found that plaintiff had the RFC to perform unskilled medium work,[13] with the following further limitations:  plaintiff could lift and carry a maximum of fifty pounds occasionally and twenty-five pounds frequently, could sit for six hours in an eight-hour work day, could stand and walk for six hours in an eight-hour work day, could climb ladders and

---

[13]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c), 416.967(c).

scaffolds occasionally and must avoid unprotected heights,
extreme cold and extreme heat (Tr. 30).

When assessing plaintiff's credibility, the ALJ found
that "the claimant's statements concerning the intensity, persis-
tence and limiting effects of these symptoms are not credible to
the extent that they are inconsistent with the medical and other
evidence of the record" (Tr. 31).

The ALJ gave "great weight" to Dr. Malaret's opinion
that plaintiff could lift twenty pounds frequently and fifty
pounds occasionally and could sit, stand and walk for six hours
continuously and sit, stand or walk for a total of eight hours in
an eight-hour day (Tr. 36).  The ALJ found Dr. Malaret's opinion
to be supported by substantial and credible evidence (Tr. 36).
The ALJ noted that Dr. Marlaret made a detailed assessment and
indicated that physical exercise could likely aggravate plain-
tiff's hypertension and arthralgias (Tr. 31).

The ALJ also gave "great weight" to Dr. Salon's opinion
that there were no objective findings to conclude that plaintiff
had functional limitations on sitting, standing, climbing,
pushing, pulling or carrying heavy objects (Tr. 32, 36).  The ALJ
also noted that Dr. Salon actually examined plaintiff and that
his findings were consistent with plaintiff's own statements
regarding his daily activities (Tr. 36).  The ALJ did not,

however, adopt Dr. Salon's opinion in its entirety (Tr. 36).  He reasoned that, as Dr. Malaret indicated, plaintiff would likely experience some limitations due to joint pain and that plaintiff's blood pressure could rise if he lifted heavy items (Tr. 36).  The ALJ also noted that Dr. Salon did not see all of the evidence in the record, given that Dr. Salon's opinion was dated October 2010 (Tr. 36).  In his discussion of Dr. Salon's opinion, the ALJ noted that Dr. Salon found that the only symptom of HIV or diabetes of which plaintiff complained was weight fluctuation and that while Dr. Salon found plaintiff to be obese, he also noted that plaintiff had a normal gait and stance and had full range of motion in all extremities (Tr. 31).  The ALJ wrote that Dr. Salon reported that plaintiff complained of pain in his left hand, knees, right ankle and left foot and that plaintiff had been told he had arthritis (Tr. 31).  At the time of Dr. Salon's exam, plaintiff also reported that he was able to attend to his personal hygiene, cook, clean, do laundry, shop, watch television, listen to the radio, read and socialize (Tr. 31).

The ALJ reviewed plaintiff's treatment notes, writing that they showed that plaintiff had received medical treatment for HIV, obesity, diabetes, hypertension and hyperlipidemia (Tr. 32).  The ALJ noted that plaintiff's physicians described his diabetes as controlled and that they described plaintiff's HIV as

30

clinically stable and asymptomatic (Tr. 32).  The ALJ also examined treatment notes from 2009 through 2011.  He noted that in 2009, plaintiff had a normal electrocardiogram and was able to walk fifty blocks on a flat surface and climb seven flights of stairs; that in 2010, plaintiff's HIV was, again, stable and his diabetes was controlled, and that in 2011, plaintiff's diabetes and hypertension continued to be well-managed (Tr. 32-33).  The ALJ also reviewed the results from plaintiff's February 2011 echocardiogram, stating that Dr. Bella found it was consistent with hypertensive heart disease with mild diastolic function, and the results from plaintiff's February 2011 stress test, which were normal with hypertensive response to exercise (Tr. 32-33). He further noted that Dr. Bella found plaintiff had no cardiovascular complaints and could walk at least half a mile without any symptoms (Tr. 33).

The ALJ gave "some weight" to the treating physicians' medical opinions, but gave "little or no weight" to the conclusory statements from Dr. Contreras and Dr. Kanter because they were inconsistent with treatment notes and were not explained or supported by objective findings (Tr. 36).

The ALJ discounted Dr. Kanter's January 2012 assessment of plaintiff's work-related abilities, stating that Dr. Kanter's "conclusions are inconsistent with Dr. Kanter's progress notes.

31

For example, a progress note dated January 2012 specifically
[states] that Dr. Kanter considered that [plaintiff]'s diabetes
and blood pressure were 'under control'" (Tr. 33).  The ALJ did
note, however, that Dr. Kanter reported that he had been treating
plaintiff on a monthly basis since September 2009 and that
plaintiff had a history of arthritis and was experiencing symp-
toms of depression (Tr. 33).

    With respect to plaintiff's pain, the ALJ noted that in
November 2010, plaintiff complained of left hand pain and that in
2011, an EMG suggested that he had carpal tunnel syndrome (Tr.
32).  The ALJ also discussed the results of X-rays taken in
September 2011 and December 2011 (Tr. 33).  The ALJ noted that
despite plaintiff's statements that he had been taking Tylenol
for pain since the 1990s, he did not see a rheumatologist until
February 2012 (Tr. 33-34).

    The ALJ discounted Dr. Kato's opinion because "[n]o
explanation or detailed analysis was provided to support the
extreme limitations mentioned in this report" (Tr. 34).  He also
noted that Dr. Kato's August 2012 report stated that Dr. Tieng
had seen plaintiff only once (Tr. 34).

    With respect to plaintiff's mental condition, the ALJ
noted that Dr. Contreras gave plaintiff a poor prognosis and
diagnosed plaintiff with major depression (Tr. 34).  The ALJ

noted that Dr. Contreras found that plaintiff was able to travel
alone and had no limitations on his activities of daily living,
but that he had marked limitations in social functioning and
concentration (Tr. 34).   The ALJ stated that Dr. Contreras "did
not explain these responses or specify [sic]" (Tr. 34).   The ALJ
went on to note that Dr. Contreras found plaintiff to have
continuous episodes of decompensation, marked limitations in all
areas of work-related functioning and found plaintiff's impair-
ments were severe enough to meet the listings in 20 C.F.R. Part
404, Subpart P, Appendix 1, with symptoms that included percep-
tual disturbances and suicidal thoughts (Tr. 35).   The ALJ,
however, discounted Dr. Contreras' opinion because her conclu-
sions were not supported by the record (Tr. 35).   The ALJ went on
to point out that plaintiff had no prior history of mental health
treatment, that Dr. Contreras' contact with plaintiff had been
extremely brief at the time of her medical source statement and
that Dr. Contreras' own progress notes contradicted her conclu-
sions (Tr. 35).

        The ALJ then found that, based on the testimony of the
vocational expert, plaintiff was capable of performing his past
work (see Tr. 36-37).   The ALJ noted that the first hypothetical
posed to the vocational expert asked her to assume an individual
with an RFC identical to the RFC that the ALJ found plaintiff to

33

have (Tr. 37).  The ALJ stated that the vocational expert testi-
fied that someone with limitations identical to plaintiff's would
be able to perform the jobs of post office clerk, security guard
and sales attendant (Tr. 37).[14]  The ALJ found, however, that the
vocational expert "did not have an opportunity to consider the
totality of the evidence," and, therefore, the ALJ adopted only
part of her testimony (Tr. 37).  The ALJ wrote that he found
plaintiff was "able to perform the physical and mental demands of
the occupation of sales attendant, which is unskilled, both as it
was actually performed by the claimant and as it is generally
performed" (Tr. 37).  The ALJ concluded, therefore, that plain-
tiff was not disabled (Tr. 37).

    C.   Analysis of the
         ALJ's Decision

         Plaintiff argues that remand is required because (1)
the ALJ failed to satisfy his duty to develop the record; (2) the
ALJ failed to accord the plaintiff a full and fair hearing; (3)
the ALJ failed to explain his credibility findings; (4) the

---

[14]There is a fundamental contradiction between the ALJ's
conclusion that plaintiff could perform his past jobs and the
vocational expert's testimony.  As discussed above at pages 18-
19, the vocational expert expressly testified that plaintiff
could not perform his past jobs of post office clerk, security
guard and sales attendant.

additional evidence submitted to the Appeals Council could
reasonably have changed the ALJ's decision and (5) the ALJ's
decision is not supported by substantial evidence (Memorandum of
Law in Support of Plaintiff's Cross-Motion for Judgment on the
Pleadings and Opposition to Defendant's Motion for Judgment on
the Pleadings, dated August 14, 2014 (Docket Item 38) ("Pl.'s
Mem.") at 19-26).

       1.    Duty to Develop
           the Record

      Plaintiff first argues that remand is required because
the ALJ failed to satisfy his duty to develop the record (Pl.'s
Mem. at 18).  Plaintiff argues that the ALJ should have contacted
Dr. Contreras and Dr. Tieng before he discounted their opinions
based on his conclusion that their reports were unclear or lacked
explanation (Pl.'s Mem. at 19-20).

      "It is the rule in [the Second] [C]ircuit that 'the
ALJ, unlike a judge in a trial, must [him]self affirmatively
develop the record' in light of 'the essentially non-adversarial
nature of a benefits proceeding.'"  Pratts v. Chater, 94 F.3d 34,
37 (2d Cir. 1996), quoting Echevarria v. Sec'y of Health & Human
Servs., 685 F.2d 751, 755 (2d Cir. 1982).

         Because a hearing on disability benefits is a non-
        adversarial proceeding, the ALJ generally has an affir-

mative obligation to develop the administrative record.
Echevarria v. Secretary of Health & Human Servs., 685
F.2d 751, 755 (2d Cir. 1982).  This duty exists even
when [, as here,] the claimant is represented by coun-
sel . . . .  The [Commissioner's] regulations describe
this duty by stating that, "[b]efore we make a determi-
nation that you are not disabled, we will develop your
complete medical history . . . [and] will make every
reasonable effort to help you get medical reports from
your own medical sources when you give us permission to
request the reports."  20 C.F.R. § 404.1512(d).

Perez v. Chater, supra, 77 F.3d at 47; accord Halloran v.

Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) ("We have

stated many times that the ALJ generally has an affirmative

obligation to develop the administrative record . . . ." (inter-

nal quotation marks omitted)); Shaw v. Chater, 221 F.3d 126, 131

(2d Cir. 2000) ("The ALJ has an obligation to develop the record

in light of the non-adversarial nature of the benefits proceed-

ings, regardless of whether the claimant is represented by

counsel."); Tejada v. Apfel, supra, 167 F.3d at 774 (same);

Randolph v. Colvin, 12 Civ. 8539 (LTS)(JLC), 2014 WL 2938184 at

*8 (S.D.N.Y. June 30, 2014) (Cott, M.J.) (Report & Recommenda-

tion) (same); Van Dien v. Barnhart, 04 Civ. 7259 (PKC), 2006 WL

785281 at *14 (S.D.N.Y. Mar. 24, 2006) (Castel, D.J.) (same).

The ALJ is required "affirmatively to seek out addi-

tional evidence only where there are 'obvious gaps' in the

administrative record."  Eusepi v. Colvin, No. 13-4037-CV, 2014

WL 6725658 at *2 (2d Cir. Dec. 1, 2014) (summary order), quoting

36

Rosa v. Callahan, 168 F.3d 72, 79, 79 n.5 (2d Cir. 1999); see
also 20 C.F.R. §§ 404.1512(d), 416.912(d) ("Before we make a
determination that you are not disabled, we will develop your
complete medical history . . . .").[15]   "[T]he current amended
regulations . . . give an ALJ more discretion to 'determine the
best way to resolve the inconsistency or insufficiency' based on
the facts of the case . . . ." Rolon v. Comm'r of Soc. Sec., 994
F. Supp. 2d 496, 505 (S.D.N.Y. 2014) (Nathan, D.J.), quoting 20
C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1) (2013).   However, the
regulations continue to "contemplate the ALJ recontacting treat-
ing physicians when 'the additional information needed is di-
rectly related to that source's medical opinion.'" Jimenez v.
Astrue, 12 Civ. 3477 (GWG), 2013 WL 4400533 at *11 (S.D.N.Y. Aug.
14, 2013) (Gorenstein, M.J.), quoting How We Collect and Consider
Evidence of Disability, supra, 77 Fed. Reg. at 10,652; accord

---

[15]On March 26, 2012, the regulations were modified to delete
language which imposed a duty to recontact a treating physician
when "the report from [a claimant's] medical source contain[ed] a
conflict or ambiguity that must be resolved, the report does not
contain all the necessary information, or does not appear to be
based on medically acceptable clinical and laboratory diagnostic
techniques."  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (2010);
see How We Collect & Consider Evidence of Disability, 77 Fed.
Reg. 10,651, 10,651 (Feb. 23, 2012) (codified at 20 C.F.R. pts.
404, 416).  The amended regulations apply here.  See Lowry v.
Astrue, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (summary order)
(applying the version of the regulations that were current at the
time the ALJ adjudicated the plaintiff's claim).

Cancel v. Colvin, 14 Civ. 2034 (PKC), 2015 WL 865479 at *4

(S.D.N.Y. Mar. 2, 2015) (Castel, D.J.).

> Thus, even where a claimant is represented by counsel
> or a paralegal, an ALJ is under a duty to seek addi-
> tional evidence or clarification . . . . "[I]f a
> physician's finding in a report is believed to be
> insufficiently explained, lacking in support, or incon-
> sistent with the physician's other reports, the ALJ
> must seek clarification and additional information from
> the physician." Calzada v. Asture, 753 F. Supp. 2d
> 250, 269 (S.D.N.Y. 2010); see also Rosa, 168 F.3d at 79
> (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir.
> 1996)). The rationale behind this rule is that "a
> treating physician's 'failure to include this type of
> support for the findings in his report does not mean
> that such support does not exist; he might not have
> provided this information in the report because he did
> not know that the ALJ would consider it critical to the
> disposition of the case.'" Rosa, 168 F.3d at 80 (quot-
> ing Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d
> Cir. 1998)).

Geronimo v. Colvin, 13 Civ. 8263 (ALC), 2015 WL 736150 at *5

(S.D.N.Y. Feb. 20, 2015) (Carter, D.J.).

> The ALJ accorded Dr. Contreras' medical source state-

ment "little to no weight" (Tr. 36). In analyzing Dr. Contreras'

opinion, the ALJ wrote:

> Dr. Contreras' conclusions are not supported by
> the record. Prior to seeing Dr. Contreras, the claim-
> ant had no history of mental health treatment, psycho-
> tropic medications or psychiatric hospitalizations.
> Her own contact with the claimant at that time had been
> extremely brief. It is not clear what the basis was
> for her extreme conclusions as to the claimant's mental
> status, particularly in light of the rest of the evi-
> dence of record. She provided no detailed information
> and no analysis. Not only are Dr. Contreras' conclu-

38

sions inconsistent with the record, but they are so
extreme that their validity is diminished.

Furthermore, Dr. Contreras' report is inconsistent
with her own progress note from the claimant's 30-
minute visit on March 2, 2011 and with subsequent
progress notes

(Tr. 35). The ALJ also wrote that Dr. Contreras did not "explain

[her] responses or specify [sic]" (Tr. 34).

While the ALJ wrote that he accorded Dr. Kato's opin-

ion, written on behalf of Dr. Tieng, "some weight" (see Tr. 36),

he appears to have rejected most this opinion (see Tr. 34).[16]

With respect to Dr. Kato's opinion, the ALJ wrote that "[n]o

explanation or detailed analysis was provided to support the

extreme limitations mentioned in this report" (Tr. 34).

To the extent that the ALJ required further explanation

or clarification from Dr. Contreras and Dr. Tieng or Dr. Kato, he

should have contacted them for further information before reject-

ing their opinions. Rosa v. Callahan, supra, 168 F.3d at 79

("[A]n ALJ cannot reject a treating physician's diagnosis without

first attempting to fill any clear gaps in the administrative

record."); accord Geronimo v. Colvin, supra, 2015 WL 736150 at

*5; Gorman v. Colvin, 13 Civ. 3227 (JG), 2014 WL 537568 at *6

(E.D.N.Y. Feb. 10, 2014) ("If the ALJ believed that [the plain-

---

[16]The limitations that Dr. Kato found were largely not
incorporated into the plaintiff's ultimate RFC (see Tr. 34).

39

tiff's treating physician's] medical opinions needed more expla-
nation, he should have asked [the plaintiff's treating physician]
to provide a more thorough account of his reasoning instead of
simply disregarding [the treating physician's] opinions alto-
gether.").

Accordingly, remand is required for the ALJ to seek
further information from Dr. Contreras and Dr. Tieng or Dr. Kato.

### 2.   Full and Fair Hearing

Plaintiff next argues that remand is required because
the ALJ denied plaintiff a full and fair hearing by stating at
the hearing that he intended to rule in plaintiff's favor (Pl.'s
Mem. at 20).  Plaintiff contends that this statement by the ALJ
denied him a fair hearing because it misled plaintiff into
believing that he did not have to cross-examine the vocational
expert (Tr. 21).  Plaintiff does not state what he would have
asked the vocational expert.

The ALJ did not fail to accord plaintiff a full and
fair hearing by expressing a preliminary view of the evidence.
The first thing the ALJ did at the hearing was ask plaintiff's
attorney if he had any questions for plaintiff (Tr. 45).  Plain-
tiff's attorney asked several questions eliciting that the

consulting physicians were seen only a single time and for
evaluative purposes (Tr. 46-47).  He then stated that he did not
have any further questions (Tr. 47).  Thus, counsel's decision to
limit his questioning of plaintiff could not have been the result
of anything the ALJ said.

The ALJ stated that he would likely find plaintiff
disabled if plaintiff provided supporting documentation for his
treating sources.  However, the ALJ made it clear that if the
documentation plaintiff submitted was not supportive of the
treating source opinion, he might not find plaintiff disabled
(see Tr. 48).

After hearing plaintiff's testimony, the ALJ stated:

> What this really comes down to, Counsel, is as long as
> you can provide the supporting documentation to those
> medical source statements, which clearly put him both
> [meeting] a listing for the emotional condition and
> definitely less than sedentary for the physical condi-
> tions, then that's fine.  I just, you know, I just
> don't like basing decisions on medical source state-
> ments that don't have any backing supporting documenta-
> tion [sic].
>
> And these doctors, it's the first I've heard of
> them.  I know these were new exhibits that were added
> after I sent out for a medical interrogatory from a Dr.
> Malred [sic] . . . , so long as there's supporting
> documentation, we won't have a problem in this case.
> Just in case, though, I'm going to go to the vocational
> expert in case, you know, you can't come up with any
> progress notes or anything like that[,] just to cover
> our bases.

(Tr. 48).

After questioning the vocational expert, the ALJ repeated his statements regarding supporting evidence.  He also stated that without supporting evidence he would likely find plaintiff had the RFC described in the ALJ's first hypothetical, while if there was supporting documentation he would likely find plaintiff had the RFC described in the ALJ's second hypothetical (Tr. 55).  Plaintiff's attorney then declined to question the vocational expert, stating that he believed "[plaintiff] definitely will fit under the second hypothetical" (Tr. 55).

The ALJ's statements did not deprive plaintiff of a full and fair hearing.  The ALJ never stated that the outcome of the proceeding was a certainty.  Rather, all he did was express a tentative opinion concerning the outcome that was contingent upon his receiving adequate documentation supporting plaintiff's claim, and the ALJ expressed no opinion concerning the adequacy of the documentation.  The fact that the outcome of the proceeding was an open issue is further evidenced by the ALJ's decision to question the vocational expert; the ALJ expressly noted that he was going to question the vocational expert in case the plaintiff's supporting documentation proved inadequate.  Although the ALJ's comments would clearly have caused plaintiff's attorney to feel optimistic about his prospects, there was never any statement from the ALJ that the outcome was certain nor did he

42

say anything to dissuade plaintiff's attorney from questioning the vocational expert.

Because the ALJ never said anything that could lead a reasonable person to believe that an issue had been determined conclusively, he did not lull counsel into believing that additional evidence was unnecessary.  He did not, therefore, deprive plaintiff of a full and fair hearing.  See Daulton v. Astrue, No. 2:10-cv-00443-REB, 2011 WL 4526745 at *7-*8 (D. Id. Sept. 28, 2011) (ALJ's statement that "we'll probably have a supplemental hearing" insufficient to support claim that plaintiff's counsel was lulled into believing he would have an opportunity to present additional evidence).

Accordingly, remand is not required on this basis.

3.   Credibility Analysis

Plaintiff also argues that remand is required because the ALJ failed to explain his credibility finding properly (Tr. 27).

It is "within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology." Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995)

43

(Leisure, D.J.); accord Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Evans v. Astrue, 783 F. Supp. 2d 698, 710-11 (S.D.N.Y. 2011) (Gorenstein, M.J.); see Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984); Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983). When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account. 20 C.F.R. §§ 404.1529, 416.929; see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980). The ALJ is not required to accept the claimant's subjective complaints; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. Gernavage v. Shalala, supra, 882 F. Supp. at 1419; accord Mimms v. Heckler, supra, 750 F.2d at 186; Richardson v. Astrue, 09 Civ. 1841 (SAS), 2009 WL 4793994 at *6 n.97 (S.D.N.Y. Dec. 14, 2009) (Scheindlin, D.J.).

> The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with

the objective medical evidence and other evidence" of
record.  Id.

Genier v. Astrue, supra, 606 F.3d at 49 (emphasis in original).

The ALJ must explain his decision to reject plaintiff's
statements "'with sufficient specificity to enable the [review-
ing] Court to decide whether there are legitimate reasons for the
ALJ's disbelief' and whether his decision is supported by sub-
stantial evidence." Calzada v. Astrue, supra, 753 F. Supp. 2d at
280, quoting Fox v. Astrue, 6:05-CV-1599 (NAM)(DRH), 2008 WL
828078 at *12 (N.D.N.Y. Mar. 26, 2008).  "The reasons for the
credibility finding must be grounded in the evidence and articu-
lated in the determination or decision."  SSR 96-7p, 1996 WL
374186 at *4 (S.S.A. July 2, 1996); Genier v. Astrue, supra, 606
F.3d at 49; Alcantara v. Astrue, 667 F. Supp. 2d 262, 277
(S.D.N.Y. 2009) (Sullivan, D.J.) (adopting Report & Recommenda-
tion).  The ALJ must specifically consider particular factors,
including:  (1) plaintiff's "daily activities," (2) "location,
duration, frequency, and intensity" of plaintiff's symptoms, (3)
"[f]actors that precipitate and aggravate" plaintiff's symptoms,
(4) "type, dosage, effectiveness, and side effects of any medica-
tion" plaintiff takes for his symptoms, (5) other treatment
plaintiff receives for relief from his symptoms, (6) "[a]ny
measures other than treatment" plaintiff uses for relief from his

45

symptoms and (7) "[a]ny other factors" regarding plaintiff's limitations resulting from his symptoms.  SSR 96-7p, supra, 1996 WL 374186 at *3.

The ALJ's discussion of plaintiff's credibility does not comply with the foregoing criteria (see Tr. 31).  Here, the ALJ's analysis of the credibility of plaintiff's statements regarding his impairments consists entirely of the following: "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the medical and other evidence of the record" (Tr. 31).  This statement is unaccompanied by any analysis of the factors relevant to assessing the credibility of plaintiff's statements as required by the regulations, 20 C.F.R. §§ 404.1529(c), 416.929(c), or any specifics regarding how plaintiff's statements were inconsistent with the medical record.  Such a perfunctory evaluation of plaintiff's credibility is insufficient.  See Kane v. Astrue, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013); Seabrook v. Astrue, 11 Civ. 5642 (GBD)(KNF), 2013 WL 1340134 at *3 (S.D.N.Y. Mar. 26, 2013) (Daniels, D.J.) (adopting Report & Recommendation); Maline v. Astrue, 08-CV-1712 (NGG)(CP), 2010 WL 4258259 at *5 (E.D.N.Y. Oct. 21, 2010).

Furthermore, the ALJ did not question plaintiff about any of his symptoms during the alleged disability period (see Tr. 42-56).  The only comprehensive discussion of symptoms and limitations from plaintiff himself was a function report prepared in 2010.  The ALJ should have questioned plaintiff at the hearing about his symptoms and limitations, particularly in light of the fact that plaintiff's alleged physical limitations appear to be caused largely by pain.  See Stemmermann v. Colvin, 1:13-CV-241 (SLT), 2014 WL 4161964 at *10 (E.D.N.Y. Aug. 19, 2014); Mejias v. Apfel, 96 Civ. 9680 (MBM), 1998 WL 651052 at *7 (S.D.N.Y. Sept. 23, 1998) (Mukasey, D.J.) (remanding where "[l]ess than a page of the hearing transcript consists of questions about plaintiff's subjective symptoms").

Accordingly, I also remand for further consideration of plaintiff's credibility.

### 4.   Additional Evidence

Plaintiff contends that remand is required for the ALJ to consider additional evidence that was submitted for the first time to the Appeals Council (Pl.'s Mem. at 25).  Specifically, plaintiff argues that the following items should be considered by the ALJ on remand:  (1) treatment notes from Dr. Kanter dated June 5 and 13, 2012, (2) a letter from Dr. Kanter dated July 2,

2012, (3) treatment notes from Dr. Sacco dated June 12, 2012, and
(4) treatment notes from Dr. Contreras dated March 22, 2012 and
May 22, 2012 (Pl.'s Mem. at 25-26).  Plaintiff argues that these
documents are material because they corroborate plaintiff's
treating physicians' reports (Pl.'s Mem. at 25).

          "If new and material evidence is submitted, the Appeals
Council [is obligated to] consider the additional evidence only
where it relates to the period on or before the date of the
[ALJ's] decision." Cahill v. Colvin, 12 Civ. 9445 (PAE)(MHD),
2014 WL 7392895 at *31 (S.D.N.Y. Dec. 29, 2014) (Engelmayer,
D.J.) (adopting Report & Recommendation), quoting 20 C.F.R. §
404.970(b); accord Rutkowski v. Astrue, 368 F. App'x 226, 229 (2d
Cir. 2010) (summary order); Baladi v. Barnhart, 33 F. App'x 562,
564 (2d Cir. 2002) (summary order).  The fact that medical
evidence did not exist until after the ALJ's decision does not
necessarily make it irrelevant to plaintiff's condition during
the relevant time period; evidence of the nature of the condition
after the relevant time period may bear on the severity of the
condition during the relevant time period.  Thompson v. Colvin,
12 Civ. 7024 (PAE)(HBP), 2014 WL 7392889 at *21 (S.D.N.Y. Dec.
29, 2014) (Engelmayer, D.J.) (adopting Report & Recommendation),
citing Pollard v. Halter, 377 F.3d 183, 193-94 (2d Cir. 2004) and
Lisa v. Sec'y of Dep't of Health & Human Servs., 940 F.2d 40, 44

(2d Cir. 1991).  In addition, "new evidence must be more than 'merely cumulative' and must be material -- that is, both relevant to the time period and probative." Cahill v. Colvin, supra, 2014 WL 7392895 at *31, quoting Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988).  "[T]his requirement has been interpreted to mean that there must be 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently.'" Patterson v. Colvin, 24 F. Supp. 3d 356, 373 (S.D.N.Y. 2014) (Gorenstein, M.J.), quoting Lisa v. Sec'y of Dep't of Health & Human Servs., supra, 940 F.2d at 43.

Plaintiff argues that treatment notes from Dr. Kanter dated June 5 and 13, 2012 require remand because they state that plaintiff had increased discomfort after three sessions of physical therapy, had developed new pain in his lower back, and that his shoulders and hands had not improved with conservative treatment (Pl.'s Mem. at 25).  Neither discomfort in June 2012 after physical therapy, new back pain nor lack of improvement in plaintiff's shoulder and hand pain a month after the ALJ's decision are facts that relate to plaintiff's condition during the relevant time period and do not, therefore, require remand. See Thompson v. Colvin, supra, 2014 WL 7392889 at *21, *23;

Shrack v. Astrue, 608 F. Supp. 2d 297, 302, 302 n.2. (D. Conn. 2009).

Plaintiff next contends that a letter from Dr. Kanter dated July 2, 2012 requires remand because in it, Dr. Kanter states that his initial report was based on "an extensive workup which started in September 2009," that despite seeing many doctors plaintiff continued to experience pain, that Dr. Sacco and Dr. Contreras have extensive experience in their fields, and that Dr. Contreras found that depression was a major factor contributing to plaintiff's inability to perform in a workplace (Pl.'s Mem. at 25). Most of these matters do not require remand because the ALJ's decision explicitly addressed them (see Tr. 33 (noting that Dr. Kanter had treated plaintiff on a monthly basis since 2009), 36 (noting that plaintiff likely would have some limitations due to his joint pain), 34-36 (discussing Dr. Contreras' opinion that plaintiff could not work due to depression). See DiBlasi v. Comm'r of Soc. Sec., 660 F. Supp. 2d 401, 407 (N.D.N.Y. 2009); Pantojas v. Apfel, 87 F. Supp. 2d 334, 339-40 (S.D.N.Y. 2000) (Kaplan, D.J.) ("[Additional evidence] does not indicate the presence of conditions or symptoms that were not known to the Commissioner when he made his final decision regarding plaintiff's disabled status."). In addition, Dr. Kanter's endorsement of Dr. Sacco and Dr. Contreras' experience

could not reasonably be expected to alter the ALJ's decision. See Lisa v. Sec'y of Dep't Health & Human Servs., supra, 940 F.2d at 43; Patterson v. Colvin, supra, 24 F. Supp. 3d at 373.

Plaintiff next contends that treatment notes from Dr. Sacco dated June 12, 2012 require remand because Dr. Sacco stated that plaintiff had been doing physical therapy since February 6, 2012 and that he prescribed Percocet for plaintiff because Naprosyn and Acetaminophen were not relieving plaintiff's pain (Pl.'s Mem. at 25-26).  The ALJ was already aware that plaintiff had been prescribed physical therapy in February 2012 (see Tr. 34), and plaintiff has not submitted notes from plaintiff's physical therapist.  However, it is possible that Dr. Sacco's prescription of Percocet for plaintiff lends credibility to plaintiff's contentions that he was in significant pain, but because the ALJ did not engage in a credibility analysis, there is no way of evaluating whether the Percocet prescription could reasonably be expected to have altered his decision.  Accordingly, Dr. Sacco's treatment note should be considered on remand.

Lastly, plaintiff contends that remand is required for consideration of Dr. Contreras' treatment notes from March 22, 2012 and May 22, 2012 because they confirm that plaintiff suffered from depression, insomnia and pain in his right shoulder (Pl.'s Mem. at 25-26).  These notes do not require remand because

51

they are cumulative.  They are substantially identical to prior
notes from Dr. Contreras, some of which also stated that plain-
tiff suffered from depression and insomnia.  X-rays already in
the record before the ALJ reflect that plaintiff had reported
shoulder pain, and it does not appear to be disputed that he did
have such pain.  There does not appear to be any new information
in these notes, and, therefore, they do not require remand.  See
Santiago v. Comm'r of Soc. Sec., 2009 WL 2496583 at *12 (E.D.N.Y.
Aug. 14, 2009); Pantojas v. Apfel, supra, 87 F. Supp. 2d at
339-40.

### 5.  Substantial Evidence

Finally, plaintiff argues that the ALJ's decision is
not supported by substantial evidence "because 'substantial
evidence' supports a contrary finding" (Pl.'s Mem. at 21-22).  I
do not reach this issue because the legal errors identified above
require remand.  See Schaal v. Apfel, supra, 134 F.3d at 504,
citing Johnson v. Bowen, supra, 817 F.2d at 986.

## IV.  Conclusion

Accordingly, for all the foregoing reasons, I deny the
Commissioner's motion for judgment on the pleadings, and I grant
the plaintiff's motion for judgment on the pleadings to the

extent of remanding pursuant to sentence four of 42 U.S.C. §
405(g) for further proceedings consistent with this opinion.[17]

Dated:   New York, New York
         March 26, 2015

                              SO ORDERED

                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Daniel L. Zelenko, Esq.
Rosa Satanovskaya, Esq.
Crowell & Moring LLP
590 Madison Avenue
New York, New York 10022

David B. Myers, Esq.
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278

---

[17]On remand, the ALJ should also explain or resolve the
contradiction in the vocational expert's testimony as discussed
above on pages 18-19 and 33-34.

In addition, although plaintiff has not raised the issue, I
am concerned about whether the ALJ properly observed the treating
physician rule.  On remand, the ALJ should ensure that his or her
analysis complies with the requirements of 20 C.F.R. §§ 404.1527,
416.927.